IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

BRIAN TAYLOR,                              )
                                           )
                          Plaintiff,       )
                                           )
v.                                         ) CIVIL ACTION
                                           )
CORELOGIC SAFERENT, LLC,                   ) 1:15-cv-1405
                                           )
                          Defendant.       )
_____)

REPORTER'S TRANSCRIPT FROM AUDIO-RECORDING

<u>MOTIONS HEARING</u>

Friday, March 4, 2016

---

<u>BEFORE:</u>      THE HONORABLE JOHN F. ANDERSON,
              Magistrate Judge Presiding

<u>APPEARANCES:</u>  ANDREW JOSEPH GUZZO, ESQ.
              Kelly & Crandall PLC
              4084 University Drive
              Suite 202A
              Fairfax, VA 22030

                  For the Plaintiff

              TIMOTHY JAMES ST. GEORGE, ESQ.
              KRISTI KELLY, ESQ.
              Troutman Sanders LLP
              Troutman Sanders Bldg.
              1001 Haxall Point
              PO Box 1122
              Richmond, VA 23218

                  For the Defendant

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria Division

(Court was called to order at 10:02 a.m.)

THE CLERK:  Brian Taylor versus CoreLogic SafeRent, LLC.

Civil action No.:  15-cv-1405.

ATTORNEY GUZZO:  Good morning, your Honor.

Andrew Guzzo on behalf of the plaintiff.

ATTORNEY ST. GEORGE:  Good morning, your Honor.

Timothy St. George on behalf of the defendant.

THE COURT:  Good morning.

ATTORNEY ST. GEORGE:  And my colleague, Kristi Kelly, is also here today, your Honor, but I will be arguing the motion.

THE COURT:  Thank you.

Well, I have read all the pleadings that have been filed in the case.  Let me just mention, on the motion to seal, I am going to need to hear from the defendant within seven days of filing the motion to seal to justify why that document and the little bit that was in the brief should remain under seal.  And it needs to be more than a pro forma memorandum in support.

I've looked at it, obviously, and have some issues as to whether it should remain under seal or not. Had there been any further resolutions or --

ATTORNEY GUZZO:  They have not, you Honor.

THE COURT:  All right.

Well, go ahead and have a seat.  Am going to take them up in an order and hear from the defendant first on some these.

Let's talk about the net worth issue first. Mr. St. George, come up.

ATTORNEY ST. GEORGE:  Yes, Judge.

Certainly, Corelogic SafeRent recognizes that there is a score of authority on this issue in terms of whether net worth, a stipulation, as proposed by plaintiff counsel, should be provided in a pretrial posture.

We've cited to the Court what we consider to be the well-reason decision of Price versus Lockheed Martin, as well as certain other like cases that are decided, including making sure it's prudent.

In this case, your Honor, we think that the net worth stipulation is particularly appropriate in light of the facts withholding it until trial particularly appropriate in light of the facts that when --

THE COURT:  Why?  What facts are there in this case you think should overcome, and I have to tell you, I was a little concern in reading the belief where

you talked about that, you know, there is nothing in footnote four that has to do with eastern district of Fourth Circuit.  But the brief itself talks about an eastern district case.

ATTORNEY ST. GEORGE:  Yes.

THE COURT:  Not only just an eastern district case in which your firm was involved in it, a case in which it, obviously, says right there in the opinion -- I mean I've got it right here -- talking about this very issue saying, "The defendant counters that the issue of net worth is not yet relevant, is there has been no finding on the punitive damages issue."

So a little troublesome reading the opposition and not directly addressing that case.

ATTORNEY ST. GEORGE:  So the Clarity decision was one that was rendered just a few months ago in Eastern District of Virginia, Judge Young.

He, certainly, acknowledged that it came out the other way.  I don't think if the court consider the authority such as Price versus Lockheed Martin.  I don't believe my firm was, actually, involved in the briefing of that issue.

Again, we submit that Price versus Lockheed is the better reading decision, especially in light of

the recent amendments to the federal rules.

THE COURT:  Tell me what the amendments to the federal rules have to do with the decision of whether net worth should be disclosed in discovery?

ATTORNEY ST. GEORGE:  So the amendment to the federal rules reintroducing, making explicit the contents of proportionality in our opinion, reemphasize that the Court should play an active a supervisory role in discovery.

THE COURT:  Okay.  So that's what am doing here today.

ATTORNEY ST. GEORGE:  Yes, sir.

THE COURT:  Am playing an active and supervisory role in the discovery.  What -- what is -- how does the proportionality come into play as whether you produce it today, whether you produce it two months from today?

ATTORNEY ST. GEORGE:  So the issue for us is not so much whether it's produced today or two months from today.  It's whether it's produced today or perhaps never produced at all.

THE COURT:  Why -- why would you think that it would never be produced?  Are you saying you are going to wait until the jury comes back before you produce it?

ATTORNEY ST. GEORGE:  So that is, certainly, what we have advocated.  The other position accepted by Price is that the Court can delay a requirement that the net worth stipulation be provided until perhaps after a summary judgment deadline has passed, or the Court deems itself to have found it to be of sufficient prima facia showing of potential for willfulness in the case.

THE COURT:  All right.

Well, what else do you have on the net worth issue?

ATTORNEY ST. GEORGE:  Your Honor, nothing -- nothing in particular more on the net worth, just that, you know, what's at issue is really a stipulation of net worth.  And in our opinion that stipulation, and the background financials that went into the compilation of that stipulation can be readily made available after a finding of willfulness.  And there really wouldn't be anything more to discover at that point and time.

THE COURT:  Well, how -- how do you know that?  I mean, the idea that we are going to go ahead and have a jury trial, have them then make the decision, and then you are going to respond to some discovery?

I don't understand how you think that's going to come into play as a practical matter.  The case is not going to be bifurcated.  So you haven't moved to

bifurcate it.  The chances of Judge Ellis bifurcating a case such as this between, you know, compensatory and punitive damages, is pretty slim to say the least.

You are going to have to put the information together before the trial because you are not going to get a delay to do that.  So the burden is exactly the same.  I mean, you are going to have to do the work to get the information together.  So that's why I am having a hard time understanding your burden issue.

You know, you are going to have to have it -- even if one was to say, "We'll wait until the jury decides," you are still going to have to do all the work you have together, because you don't know what the jury is going to do.

So, you know, the work is going to have to be done by your client.  You know, I am just not convinced that anything that you are saying here is significant enough to overcome the presumption that discovery is to be done during the life of the case.

And, you know, this also comes into play.  I mean, the parties need to have enough information to properly evaluate the case for settlement purposes.  And the net value, and there is clearly a claim for punitive damages and whether it has a lot of legs to it or not, I don't really know.  I mean, I've read the facts, and the

circumstances, and some of the issues of different names and different dates, and different dates birth and things like that being used, and things would lead one to believe that that case may -- that a punitive damages claim may get to the jury.  I don't know.

But, you know, that information, I think, is relevant.  I think it's, obviously, something that could be taken into consideration on the punitive damages claims, and I am going to require it to be produced.

What it is I am going to require to be produced, I am really -- that's more of what -- what I have an issue with.  I mean, obviously, 24 quarters of net worth information is well beyond anything that would be reasonable in this case.

We might -- my initial thoughts were to require that there be a statement as to what the net worth was at the end of 2014, and the end of 2015, and provide documents sufficient to show how that was calculated.  So, Mr. St. George, what -- what --

ATTORNEY ST. GEORGE:  Well, my -- my position will, obviously, be that there are sort of two relevant time periods in the case.  The one would be February 2015, which is when the report itself was, actually, generated.

So I would say that there would be one net

worth stipulation that would really be appropriate would be that time period.  If not, then the court could use the present net worth.

THE COURT:  Yes.  I mean, the only reason I was doing that was because I would expect that your client's financial records are not kept such that it would be easy for them to make a determination of a date in the middle of February that the end of the year, or end of a quarter, or something like that, it is probably more financial information available and whether it would be 2014 or 2015.  I don't know what's my --

ATTORNEY ST. GEORGE:  And my other thought would the be that in ruling in that manner and requiring the production of any underlying documents and the like, the Court would actually be going farther in the parties' meet and confer sessions which was a stipulation.

THE COURT:  Right.  Well, you know, the parties had a chance to work it out.  They didn't do it.  And, you know, am looking at the discovery requests that were here.  You certainly had an opportunity to agree to a stipulation.  You didn't do it.  You brought the issue in front of the court, and the court now decides what it is it's going to do on the pending interrogatories, and the pending requests for production of documents.

You know, a stipulation doesn't mean you just tell them, and they agree to it.  You provide them with information.  They have to degree to that stipulation.

I think it's important enough that you provide them with a number that you say is -- this is how we -- this is what we have calculated to be our net worth, and you provide them with the documents sufficient to show how that number was calculated, not all documents, not, you know, all that kind of stuff.  But you got to -- you can't just give them a number.  You are going to have to give them a number and give them some documents that shows how that number was calculated.

ATTORNEY ST. GEORGE:  Okay.

THE COURT:  Okay?  So, I mean, would you need 2014 and 2015?  Or is 2015 -- the end of 2015 probably sufficient?

ATTORNEY GUZZO:  2015 would be fine, your Honor.

THE COURT:  All right.

I'll go ahead and order it for just documents -- the net worth as of the end of 2015, with documents that are sufficient to show how that net worth was calculated.

ATTORNEY ST. GEORGE:  The only thing I would add judge if -- if perhaps SafeRent is on a different financial calendar than the calendar year, perhaps a different fiscal schedule, that we be able to use the calendar that closed as close to the end of 2015 if possible.

THE COURT:  Well, you don't know --

ATTORNEY ST. GEORGE:  I am sure how --

THE COURT:  How it is?

ATTORNEY ST. GEORGE:  I am not sure how keeps, if it's on a calendar schedule or fiscal year accounting schedule, you know, pursuant to some other internal accounting guidelines.

THE COURT:  Well, I have made my ruling.

ATTORNEY ST. GEORGE:  Okay.

THE COURT:  If you want to have a discussion with them following what you finding more information relating to that, then you can do that.  If you all want to create another date, but I think under the circumstances I'll keep it.

ATTORNEY ST. GEORGE:  Yes, your Honor.

THE COURT:  Okay.

And the next issue we will deal with is the 1681e(b) issue, about the procedures to assure the maximum accuracy.

          Let me make sure I understand procedurally
what happened.  They sent a document request asking for
all policies and procedures, manuals instructions, those
kinds of things.  You responded saying, "It's all in the
computer.  We don't have any documents."

          ATTORNEY ST. GEORGE:  Yes, Judge.

          THE COURT:  Which ended up being not
accurate, right?

          ATTORNEY ST. GEORGE:  That is correct.  That
in our meet and confer session.

          THE COURT:  Well, let's not just go --

          ATTORNEY ST. GEORGE:  Yes.

          THE COURT:  When you serve discovery -- when
you you responding to discovery requests, it's an
obligation to respond to them without having to go
through meet and confer and produce the documents that
are responsive to the request, and not make
representations that there are no such documents, or
they don't exist.  And then have to be poked in a meet
and confer to then go do what are you supposed to do
initially.

          So help me understand how it was that your
client indicated that there weren't any such documents
and then, once you were forced to go look for them, or
whatever, you found some.

ATTORNEY ST. GEORGE:  So judge it's not that we didn't, usually, look for the documents.  And we talked to a number of custodians SafeRent, asked them to go do diligence, asked them, specifically, about these manuals that were memorialized in quote/unquote, "plain English," the maximum logic.  None of them were able to find anything, represented to us that was in the code, and that was verified by our client in the interrogatory responses.

We continued to keep looking, had a couple follow-up conversations with the client in connection with the meet and confer on issues that had been discussed.  We were directed to this document that was then provided.  Consistent with our Rule 26(a) supplementation obligations we, properly, supplemented it.

It wasn't as a result of meet and confer sessions we started working.  It was simply a matter of a new document being identified during the course of litigation, you know, approximately two weeks after our document production was due.  It was promptly supplemented and that's where we were.

The issue that has been identified in the motion to compel is that it's marked as Version 2, frankly, I was not aware of that.  I hadn't filed that

issue.  It was not ever part of any subsequent meet and confer session or anything like that.

And if we had been asked, we'll clearly go back and see if there is a Version 1.  I haven't been informed that there is a Version 1.  My suspicion is that version one was overwritten through Version 2.  But, certainly, we'll go back; and if there is a Version 1, we'll produce that Version 1 as well.

THE COURT:  Before I even got the reply, I mean, when I looked it, it is pretty clear on the face of it.  It says version 2.0 is what it actually says.

ATTORNEY ST. GEORGE:  Right.

THE COURT:  You know, there is a lot of focus on the date, the date being May 20th.  Right below the date being May 20th, it says version 2.0.

ATTORNEY ST. GEORGE:  Then we have confirmed that -- so the document itself discusses the change that was made is the matching process in October 2015.  There were no subsequent changes.  We represented to plaintiff's counsel that this is the same matching process that was in place at the time of February 15th.

We are not aware -- I haven't seen Version 1.  We are not aware of a Version 1, but we will, certainly, go back and promptly request any Version 1 if it does exist.

THE COURT:  And what does it mean when it says, "Entity matching phase two?"

ATTORNEY ST. GEORGE:  I am not.

THE COURT:  Just looking at the cover page of the document, says, "Entity matching phase two."

ATTORNEY ST. GEORGE:  My suspension is that it talks about the change in the process from November 2014 to the present, for having discussed that specific phrase with the client.

THE COURT:  What in -- I know you -- you are on both sides of these issues sometimes.  And when I say, "these issues," it's when you get responses to document requests that say, "Subject to a broad set of objections, I am going to give you some documents."

You know, that really puts the receiving party in a significant disadvantage because they don't know whether you really have documents that you are withholding based on some objections or not.

ATTORNEY ST. GEORGE:  So what we have done in our request for production is where we were aware of specific documents that are being withheld we included a withhold statements, noting that documents were being withheld.  That's consistent with amendments to Rule 26.

THE COURT:  Why -- why do you continue to assert the objections if there are no responsive

documents that you have been able to locate that would

be subject to those objections?

ATTORNEY ST. GEORGE:  Well, for instance,

many of the interrogatories are unbounded in time or

request for production are unbounded in time.  Even we

wouldn't even agree that a limitation of five years is

appropriate given a two-year statute.

It's not as if all the concerns of the

document request had been remedied.  But there isn't any

substantive dispute no any longer pending.  Obviously,

if we were to withdraw the objections we would, in need

of revise interrogatory that, you know, was sufficient

to meet those objections.  But the substance of the

dispute has been resolved.  And we didn't append any

withholding statement in connection with these documents

because, as we've explained, we weren't actively

withholding any documents at that time.

THE COURT:  Well, I want to you look for

Version 1, that document.  I am also going to grant the

motion to compel, and this is -- just to be on the safe

side, I don't think this is -- from what you've

indicated, I don't think that there is -- will have any

significant impact.  But I want you to look for Version

1 and produce it if it's out there.

In addition to that, am going to grant the

motion to compel and require the defendant to produce any and all policy, manuals, procedural manuals, instructions, guidelines, that kind of typed information, which describe your policies, practices or procedures designed to maximize the accuracy of your public information that were in existence or applied to the time period during 2015.

I do want you to understand that if nothing else gets produced, other than what has already been produced in Version 1, you are not going to be able to use any other documents going forward to say our policy on this issue was, you know, X, Y, or Z.

So this is -- this is going to be your last chance for your client to find whatever information your client has that it intends to use to support, you know, it's position that it does take reasonable positions to assure the maximum accuracy of the information.

So what it was doing is following it's reasonable policies and procedures back in February of 2015.  So that should take care of that issue.

The documents having to do with request production of documents number four, that is the assigning information consumer file, including the matching procedures and algorithms.  I think I need to hear a little bit more from plaintiff on this one to

make sure I understand what that issue is and what they
have and whether there is anything else that would need
to be produced.

ATTORNEY ST. GEORGE:  Thank you, your Honor.

So in this case the basic theory --
plaintiff's is that SafeRent does not use adequate
matching policy and procedures for the way it assigns
consumer information to a file.

The version on the manual that we have I
believe outlines it's basic matching criteria.  That is,
that it, essentially, matches with a name, date of
birth --

THE COURT:  Right.

ATTORNEY GUZZO:  -- to the consumer file.
So what we are seeking in this motion is any additional
documents that outline the filters or the matching
criteria that they use.  The May 20, 2015 policy that's
three months after the consumer report.

THE COURT:  But they made it clear to you
that it described the policy -- it describes the
procedures that were used in February.

ATTORNEY GUZZO:  Correct.

THE COURT:  Changes were made before
February of 2015.  This policy describes those
procedures that were in effect when this report was

generated in February of 2015.

ATTORNEY GUZZO:  Correct.

And I guess our particular concern here is whether there was additional or supplemental documents. And if you have seen the e-mail correspondence back and forth, we wanted to confirm that this, essentially, is it only policy that exist.  There is no supplemental. There is no additional filters.  There is no other methods that they used in certain situations.

We just want to make sure that every single time they matched the criteria, this is the policy that was used.  Also, if you've looked inside the policy manual, it references that they made this change in response to strategic customer --

THE COURT:  You know, I understand what your argument was.  But that was back in the -- the deployment of the new rule was deployed in October of 2014.

ATTORNEY GUZZO:  That's with regard to the policy.

THE COURT:  Well, what it says is that they were done in 2014; that, you know -- and what was done in 2014 carried forward through February of 2015 and that, you know, this document prepared in May of 2015 describes the process that was in place.  The changes

that were made in October 2014, and the process that was

in place in February of 2015.

ATTORNEY GUZZO:  Correct.

Yes, your Honor.

I mean, the one thing I would add to that is

these procedures are the crown jewels of the credit

reporting agencies.  I would be surprised, just based on

my experience in this field, that a six-page document

is -- is really the only policy or procedure that they

have.  But if that's it, that's it.  And we're -- we're

happy with that.  We just would like to sure up the

response that this is the only matching criteria that

has been used.

THE COURT:  All right.

Well, Mr. St. George, you know, again, this

is an issue in which, obviously, that type information

is relevant.

ATTORNEY ST. GEORGE:  Yes, your Honor.

THE COURT:  You know, I am going to do, for

the most part, what I did for the other one, and that

is, you know, I am going to require you to look for,

produce, without any objections, as to any documents

that describe or relate to or, you know, manuals,

whatever, that describe the procedures that existed in

2015.  You know, if there aren't any others, there

aren't any others.  But if you can't --

        ATTORNEY ST. GEORGE:  Yes, your Honor.

        THE COURT:  You can't.

        ATTORNEY ST. GEORGE:  That's our understanding.

        THE COURT:  And, again, the same restrictions are going to hold that, you know, you are not going to be able to come up with something, you know, a month from now and say, "Oh, by the way, there is another document."

        ATTORNEY ST. GEORGE:  No.  I understood. And I would just add that this document wholly describes the matching process.  I mean, there is -- there is no -- there is no gray area in terms of its description.

        So we are not presently aware of any documents.  But, you know, the limitation the court is imposing should be of no moment.  There is no -- there is no dispute that these were the procedures that were applied.  But as -- as we mentioned, we are not presently aware of any documents.  I'll look for Version 1 to the extent it exists.

        THE COURT:  All right.

        Let's go to 1681(g) issue.  And, Mr. St. George, let me -- let me -- you know, maybe I don't understand this issue well enough.

ATTORNEY ST. GEORGE:  Okay.

THE COURT:  But my impression from, at least, reading the pleadings, and I haven't seen the actual report that was provided to the plaintiff.  But if there was information on that report basically saying that this -- is it Crimcheck -- this multistate criminal search report by Crimcheck America is on that document. And there is nothing on that document that says Crimcheck America is part of a subsidiary of or it is any way affiliated with your client.  Then isn't that not being clear and accurate disclosure of the information?

ATTORNEY ST. GEORGE:  The 1681(g) source claim -- so two issues, Judge.  So 1681g(a) governs file disclosures.  So when consumer writes to a consumer reporting agency and says, "We are providing a copy of their file," --

THE COURT:  Right.

ATTORNEY ST. GEORGE:  -- "and they are required under the FCRA to provide a copy of their file, that happened.  Mr. Taylor sent a letter to SafeRent. SafeRent responded.

No question that the core function of 1618g(a) has been satisfied.  The claim that's being assorted is much more technical than that.  It's that

SafeRent failed to disclose the sources of its
information.  And the claim in the complaint is that
Crimcheck failed to disclose -- excuse me -- SafeRent
failed to disclose an intermediate source.  Albeit was
disclosed Crimcheck America, which Crimcheck America,
like we represented in our sworn responses, is just an
agency brand name.

So there is no intermediate source to
disclose.  The policy and procedure manual that governs
handling files disclosures has no mention of
intermediate sources because, again, it wouldn't.  The
factual predicate for this claim is just --

THE COURT:  But the information that the
consumer gets is supposed to clearly -- clearly and
accurately disclose to them the source of the
information, right?

ATTORNEY ST. GEORGE:  Yes, Judge.

THE COURT:  So having on that something that
one would read that says, "The multistate criminal
source report by Crimcheck America," wouldn't that lead
some person who calls SafeRent and says, "Send me my
report," and they get a report from SafeRent that says,
"This search report was done by Crimcheck America,"
wouldn't that lead one to believe that there was an
intermediary involved?

ATTORNEY ST. GEORGE:  So I think -- I think having not seen the report, and I would be happy to hand up a copy of the report if you would like, it doesn't represent that it's by Crimcheck America.  It doesn't make any sort of explicit representation in that regard. The only --

THE COURT:  It just search report by Crimcheck America.

ATTORNEY ST. GEORGE:  It just says, "Crimcheck America," at the top.  It's the brand that's applied to that particular section of the report.  And that's, actually, removed from the record section where the jurisdiction is enlisted.  And bringing your Honor back to the core issue, there is no intermediate entity to identify.

THE COURT:  If you -- if identifying intermediate entity, and that's not accurate, then you are not being clear -- you are not providing clear and accurate disclosure of source information.

ATTORNEY ST. GEORGE:  So that's not the claim pled in the case.  The claim is that we failed to identify an intermediate entity.  I mean, that's just the complaint itself.

But there is no representation that Crimcheck America was the source or anything in that

regard.  Like I said, even -- even if some how, you know, the court not having seen this report would draw that inference in the abstract, the policy and procedure manual here doesn't address that source claim.  You know, there is -- there is no relevance to the policy and procedure manual.  And that's our position.

THE COURT:  Is there anything in the policy and procedural -- policy and procedural -- procedure manual that says -- has to do with what we do in order to make sure that we are providing clear and accurate disclosure of source information?

ATTORNEY ST. GEORGE:  I haven't seen anything that references the sources or anything that would -- nor Crimcheck America, nor anything in that regard.

THE COURT:  Well, am talking about, you know, this policies and procedural manual that you have --

ATTORNEY ST. GEORGE:  Yes.

THE COURT:  -- what -- what, in fact, does it address?

ATTORNEY ST. GEORGE:  It addresses the process for processing a consumer file disclosure request, which the administerial steps that are taken in order to do that, and where the agent who is in charge

of that process goes, pulls the reports, how they are generated, how they are mailed, et cetera, administerial steps in that regard.

THE COURT:  But there is nothing in that manual that says, "We need to make sure that we are providing clear and accurate disclosure of the source information or these steps need to be taken to make sure that the source information we are providing to the consumer is clear and accurate."

ATTORNEY ST. GEORGE:  I have not seen anything in that document in that regard.  I will -- I will double-check again.  But I have not seen anything in that regard.

THE COURT:  Well, then, why -- why would you say that manual is even responsive to the request as opposed to we are withhold it from the request if there is nothing that relates to that information in the manual?

ATTORNEY ST. GEORGE:  Sir, we could have been less transparent.  We could have just stood on our relevancy objections which were made.  But we included the withholding statement that said, "We are holding a manual that relates to the process or file disclosures under g(a), which is true.

THE COURT:  Mr. Guzzo, let me -- let me hear

from you.  If they are going to take the position and
uphold the position that we have no manuals, policies,
or procedures that describe how we are to clearly and
accurately disclose the source of information, isn't
that going to be good for you?

ATTORNEY GUZZO:  Yes.

I think that is, essentially, good for us if
there is a response that says, "We have no documents
that say we have a policy or procedure for compliance."

The discovery response, essentially, would
work as an admission in that case.  I would like to look
at the policy to confirm for myself.  You know, I think
you could look at different things in these internal
policies and gather different information.  And I think
the absence of the policy itself is relevant, especially
when they have a policy or procedure for compliance
which 1681g, the fact that g(A)(2) has been omitted,
would be relevant to us to show to a jury that, you
know, they have considered this section.  G(A)(2) has
been part of the statute for 45 years, your Honor.  And
the fact that they have no policy and procedure in place
whatsoever would be significant to us.

And just to clear something up that I
think -- the overarching claim in this case is that the
defendant failed to comply with Section 1681g(a)(2).  I

believe Mr. St. George is narrowly talking about our complaint in the sense that Ms. Kelly and I had interpreted Crimcheck America to be the entity that was identified as the source.

It's our position, based on what we know -- know in discovery that the source of the information was the Ohio and the Michigan Department of Corrections. Those are the entities that, actually, gave the records directly to the defendant.

So, to the extent --

THE COURT:  I know you already admitted they weren't described accurately in the report.

ATTORNEY GUZZO:  Correct.

THE COURT:  In Ohio and not the Department of Correction.  So, I mean, I know that's an issue out there.  But the discovery request that's in front of me has to do with, you know, the policies and procedures behind what they do in order to make sure that they are complying with the requirement of clearly and accurately disclosing the sources of information.

ATTORNEY GUZZO:  Well, to answer your question, your Honor, I am sorry I went on a little longer.  But no pol- -- a response that they have no policy would be sufficient for us.

THE COURT:  Well --

ATTORNEY ST. GEORGE:  And, Judge, just to respond, not that we have no policy, we do have a policy.  The policy just isn't germane to the technical and confused claim that's been asserted.

So we are not going to be locked into some admission that we done have a policy to comply with this section of the statute.  We do have a policy, and we did comply.

THE COURT:  Well, where are the documents that support your claim that you do have a policy?

ATTORNEY ST. GEORGE:  It's the document that's being withheld.  It's just not germane to the sub-issue that's being asserted, and this is factually confused beyond all measure in this case.

THE COURT:  Well --

ATTORNEY ST. GEORGE:  I don't -- I just want the record to be clear that there is no sort of admission that we don't have the policy.  It's just the policy doesn't intersect with the claim that's been asserted which is, itself, incorrect.

THE COURT:  Well, the claim that's being asserted is a violation of 1681g(a)(2), and there are some issues as to whether it has to do with the intermediary or the accuracy.

But, you know, the discovery request -- "All

documents, manuals, guides, or procedures, or other materials awaiting your policies or procedures for compliance with 1681g(a)(2)."

        If they are alleging a violation of 1681g(a)(2), why isn't your clients documents, manuals, guides, or procedures, or other materials relating to those policies or procedures, relevant and discoverable.

        ATTORNEY ST. GEORGE:  The reason why is because the claim has been identified is not at all implicated by the policy manual that exists.

        They've pled a violation of the statute, but the document that we have does not intersect with that sub-technical claim -- sub-issue technical claim that's been -- that's been pled.

        THE COURT:  What -- what is 1681g(a)(2) specifically require?

        ATTORNEY ST. GEORGE:  It's the file disclosure request provision in the identification of the sources of information.  It's the -- it's the provision of the FCRA that a consumer can invoke or request a copy of his or her file from a consumer reporting agency.

        THE COURT:  And as a part of that that it has to be clear and accurate disclosure?

        ATTORNEY ST. GEORGE:  Yes, Judge.

THE COURT:  Well, is it true that there is nothing in your manual -- documents, manuals, guides, or procedures relating to the requirement that the information has to be clear and accurate?

ATTORNEY ST. GEORGE:  Your Honor, I am not sure that -- I mean, that in SafeRent's policy and procedure manual it discloses all the information -- it talks about how you go about generating the file disclosure, which includes obtaining a copy of the report which itself contains verbatim, the information that was received from the sources and the jurisdictions that are identified.

So I don't know exactly how to respond to your question.  It's SafeRent's position, obviously, that what it does is clearly and accurately responsive.  But, again, that's not the issue.  The issue is, did we fail to identify an intermediate source.  Every one in this room now agrees that that is not the case.  Crimcheck America is not an intermediate source.

THE COURT:  But -- but the issue still is out there.  If you have a policy that says, "We have to clearly identify where we get the information from as part of your policies," and they are going to be able to make the argument that the report that you sent to my client doesn't comply with that policy, because it

doesn't, clearly, identify that -- because it has this
Crimcheck reference on it, it is not clear who,
actually, got to that information.

And so that's -- that's why that issue is
still in the case, you know.  We now -- we now know that
Crimcheck isn't -- you know, wasn't involved, but they
still show up on a report that was provided.  And that
still keeps into play whether what you provided to the
consumer in this case was clear.

ATTORNEY ST. GEORGE:  So the issue as pled
in the complaint is that we identified Crimcheck.  We
did not identify intermediate source.  This is the
plaintiff's complaint in which the whole case is framed
around.

THE COURT:  Well, that one claim.

ATTORNEY ST. GEORGE:  And that's the claim
that the subject disputes --

THE COURT:  You said whole case.

ATTORNEY ST. GEORGE:  Yes, sir.

THE COURT:  They've got a lot of other stuff
in this case.

ATTORNEY ST. GEORGE:  One other claim.  That
predicate is indisputably false.  So there is no
intermediate source to identify.  The document does not
describe the identification of any intermediate source

because there is no intermediate source to identify.

All I am trying to do is link the potential relevance of the document to the claim that's asserted, and there is none.

THE COURT:  And the reason I don't understand why it wouldn't be relevant, I am a consumer. I get a report.  The report has mentioned on it an entity that I have no idea who it is, Crimcheck.

So, you know, I -- I called SafeRent.  You know, I understand you gave my potential landlord a report that says, you know, "Am a convicted felon in two foreign jurisdictions.  I want to know where that came from."

You then send me the report, as you are required to do.  I get it, and it has on there Crimcheck America -- a reference to Crimcheck America.  I, looking at that report, I would think it would be reasonable for someone to think that Crimcheck America somehow was involved in this process, otherwise there wouldn't be any need to put them on this report, right?          And if, in fact, you were providing what was not an accurate or clear disclosure, then wouldn't that be a violation?

ATTORNEY ST. GEORGE:  To the report is branded SafeRent.  Everything about the report is SafeRent.  On the multistate criminal history, on the

header, it's described as Crimcheck America section of the report.  It then lists the records in the originating jurisdiction.

            THE COURT:  Right.

            ATTORNEY ST. GEORGE:  The requirements of g(a) are to disclose the -- clearly and accurately disclose the sources of the information.  Crimecheck is not represented as a source.  What they -- and they don't claim that in the complaint.  What's pled is that we failed to identify the intermediate entity that supplied the information to Crimcheck.  There is no intermediary entity.  There is no -- there is no Crimcheck.

            So what I am trying to do is bring -- bring the actual claims that were pled back to the text of the FCRA provision at issue.  And the document at issue just doesn't relate to those processes.

            You know, this is a hyper-technical sub-claim g(a).  It is not an allegation that we failed to comply with the core provisions of the statute.  And the core provisions of the statute were implicated by that policy document not this hyper-technical sub-claim.

            THE COURT:  What are the core policies that this manual does deal with?

            ATTORNEY ST. GEORGE:  It -- it deals with

how to go about collecting all of the information that we have on a particular consumer, packaging it up, and sending it to the consumer.  Basically where to go, where to look, what to gather, what's a respond, how to respond.  That's what it deals with.

THE COURT:  Well, the "How to respond," why wouldn't that be relevant?

ATTORNEY ST. GEORGE:  Because it doesn't address the source issue.  It -- it just does address --

THE COURT:  It doesn't talk about how we have to disclose the source of the information?

ATTORNEY ST. GEORGE:  Correct.

It's a process of gathering all the information that we have at SafeRent and disclosing it to the consumer.  And there is no discussion about the source of the information.

Again, the source of the information is set forth on the face of the report.

THE COURT:  Well, not -- well, I mean --

ATTORNEY ST. GEORGE:  I mean --

THE COURT:  -- maybe there is an argument about whether saying Ohio is a clear and accurate description if you got it from, you know, the Department of Corrections in Ohio.

ATTORNEY ST. GEORGE:  I understand.  Not --

not a claim that's pled, but I understand that position.
The source the document itself that is not detailed any
further action taken in that regard.

THE COURT:  So what -- when I was saying
that you don't have any policies or procedures that deal
with the requirement of clearly and accurately
disclosing the source of the information, do you seem to
be concerned about that?

ATTORNEY ST. GEORGE:  Right.  I thought
that -- I think the statement is -- is broader.  So the
admission that was being represented by Mr. Guzzo is
what's troubling to me.  There is no admission here that
we don't have a file disclosure policy and procedure
document.  Whether we don't comply with consumer file
disclosure requests or anything like that.

Our position is that the source is
accurately represented on the face of the policy, and
the policy and procedure manual does not address the
specific source claim -- the technical source that they
are advancing.  That's the position.

So I don't want to the appear as if SafeRent
has somehow admitted liability coming out of this
hearing with respect to that particular issue.

THE COURT:  No. We are not -- we're not --
but what I am trying to get at is whether you do or

don't have any policies and procedures that relate to the requirement for clearly and accurately disclosing the source of the information.

ATTORNEY ST. GEORGE:  And our position is that the policy and procedure document, which governs our files disclosure request, is an administerial document that talks about how you go about gathering all the information in the consumer's file.

It's our position that the source is accurately represented from the beginning.  It's our position that the document doesn't further describe the source question, and especially not the source claim that's been pled, which is wrong.

THE COURT:  So you don't plan to use this document in any way whatsoever in the trial of this case?

ATTORNEY ST. GEORGE:  Of course.  If we don't produce it, we don't intend to use it.

THE COURT:  Okay.

Well, I think given the representation that the manual doesn't specifically address the requirement for clear and accurately disclosing the source of the information, only the information, then am not going to require the manual to be produced.

Going to the lawsuit issue, Mr. Guzzo, why

three the years, and why anything having to do with the actual resolution of the lawsuits?

ATTORNEY GUZZO:  Your Honor, three years other -- no other reason than, I guess, that's what Judge Davis ordered in the case that we had with him when we asked for five.

We believe three years probably give the relevant timeframe that they had notice and knowledge of the inadequacies of their policies and procedures.  I don't think SafeRent had been around much longer than that actually.

So I think three years would give us a sufficient basis to say -- I think the lawsuit, just based on my own research, is probably about the 20 lawsuits in three years more or less.  And that's what Judge Davis ordered.  And I think it was Tamblay and so that was -- that was why we agreed to limit it to three years.  We don't need resolution if anything is confidential.

So we would agree to withdraw that aspect of the interrogatory.

THE COURT:  Okay.

Mr. St. George, let me just hear your argument on the lawsuits having to do with -- you know, obviously, you saw in the reply they are doing, it's not

only willful, by notice issues, have to do with the lawsuits.

ATTORNEY ST. GEORGE:  Well, interestingly, this dispute is not one of substance.  Simply, Mr. Guzzo just represented that through his own research has been able to uncover 20 lawsuits.

Well, those are the same 20 lawsuits that would be identified by SafeRent if compelled by the court.  They are to PACER.  Any EV- --

THE COURT:  Let me understand.

ATTORNEY ST. GEORGE:  Sure.

THE COURT:  So you think that if you get a document request you can say -- you can go get the information yourself, even though I have the information, and that's a adequate way to respond to the document request?

ATTORNEY ST. GEORGE:  The response is that the information is publicly available.  And it's just as easy for you to type "SafeRent" in PACER as it is for us to type "SafeRent" into PACER.

THE COURT:  You have -- you have all the -- I mean, you were involved in these litigations.  So it's not exactly the same.  PACER doesn't involve state court cases.  These may or may not have been brought in state court.

ATTORNEY ST. GEORGE:  We are -- we are not aware of any EV lawsuit that would have been filed in state court and not be removed to federal.

SafeRent would have removed all cases within the three years, and I am not aware of any state court lawsuits.  And, yes, that's exactly what the court in the Ab- -- excuse me -- the Abodaca case, that it is just as easy for you to get it as it is for us.

Ironically, that's a case that cited in plaintiff's motion to compel, you know, and a request for a production of documents would allow to direct plaintiff to the information that would be equally and burdensome to compel.

Obviously, we object that the settlement information as off the table.  What I think is more fundamental, however, Judge, is these are hearsay representations made by members of the plaintiff's bar. They had no bearing at any issue in this case.

Willfulness, I think, is addressed sufficiently by Safeco.  Obviously, the hearsay opinions of member of the plaintiff's bar and certain third-party consumers doesn't bear or willfulness.

In terms of notice, again, these are -- these are hearsay representations.  What will matter, perhaps, in what the Court in Equifax versus Miller held

is that may be prior jury verdicts could inform a
finding of willfulness or negligence when something,
actually, get resolved by a court.  That's not the case.
And we've identified in our interrogatory responses and
a request for production that there are no jury
verdicts, there are no summary decisi- -- summary
judgment decisions against SafeRent.

All that we are talking about is a minute
fraction of a single percent of cases that may have
ended up in litigation again SafeRent, and they would be
hearsay representations not germane to the facts of this
case or the claims asserted, not resulting in any
summary judgment, and not resulting in any jury verdict
in which are usually available to plaintiff's counsel.

It's not a dispute of substance, but it's
also one that's irrelevant and, ultimately,
inadmissible.  If, you know, they want to say that
SafeRent has previously been subject to litigation, well
they can find that just as easily as we can.

Well, that wasn't their request.  Their
request was a compound objectionable request for all
documents, all settlement information, none of which is
relevant to this case.  That's our position, Judge.

THE COURT:  All right.

Well, I am going to require you identify the

lawsuits, but only the style of the case, the court in which the action was brought, and the case number.  I am not going to require it to go any further beyond that, so you'll need to --

ATTORNEY ST. GEORGE:  You said, am sorry, the style --

THE COURT:  The style of the case, the case in which the action was brought, and the case number. That would give them sufficient information if they decide they want to go further to locate the plaintiff's attorney, any co-defendants in the case, the date it was filed.

ATTORNEY ST. GEORGE:  The date within the three-year period?

THE COURT:  The three years.

ATTORNEY ST. GEORGE:  Okay.

THE COURT:  Okay.  But you are not going to have to disclose the terms of any settlement or anything like that involved in that.

All right.  That leaves us with, I think, one more issue; is that right, Mr. Guzzo?

ATTORNEY GUZZO:  That's correct, your Honor.

The final issue is interrogatory six, very similar in concept.  Essentially, we seek any e-mails, other documents, internal correspondence, anything in

SafeRent's possession going to the effectiveness of its policies or procedures, any problems that has identified.  To the extent that SafeRent has noticed or even just the documents itself, the May 20, 2015 manual, discussed this consumer complaints and customer complaints that it has received.

And, essentially, what we would like to show or what we think it would show if such documents do exist, is that SafeRent has knowledge that it uses overly broad matching criteria.  It understands that it generates a lot of false-positives based on this matching criteria that it uses.

However, it continues to use this same policy and procedure to the detriment of consumers like Mr. Taylor because it believes that its clients would rather have more false-positives than, essentially, lose out on some of the potential accuracies.

So to the extent that there is internal correspondence, or any other documents in its possession, regarding tinkering with its procedures, the problems, any filters it may have used, we believe that that information is discoverable and, ultimately, admissible in this case to show not that the problem that happened to Mr. Taylor was foreseeable.

This is not anomaly.  This is something that

we believe could have been easily avoided by adding, you know, some filters and that SafeRent knew this and had prior problems with it but did nothing to change it.

ATTORNEY ST. GEORGE:  Judge, I feel like the court has largely already addressed this issue.  The policy manual that was produced in Version 2 describes wholly the process that was used.  It also describes the process -- the changes that were made in response to the customer feedback before the plaintiff's report was generated in February 2014.  So those changes took place in October 2014.

There have than been no change to matching algorithm.

THE COURT:  But had there been any research, studies, reports that discusses the new policy?  And when I say, "The new policy," the policy that went into effect in October 2014.

So, you know, and I understand that the problems that you may have had before October of 2014, probably aren't really significant in this case because we have to deal with the policies that were in place in February of 2015.

So am -- I want focus on once you implemented these new policies apparently in or about October of 2014.  Are there any document that would be,

or any information that you should identify in response

to interrogatory number six, as to research, studies,

reports, memos, e-mails that discusses or references,

you know, the compliance with the new policies?

ATTORNEY ST. GEORGE:  Well, I mean, Judge,

we've, obviously, taken the position that what matters

is what happened at the time of the report.

You know, I -- frankly, I don't know if

there is some memo analyzing the new process.  All I can

tell you is there has been no changes to that process at

that the time period that it was introduced.

The matching process has been fully and

completely described in that policy manual.  It even

contains specific audit of the difference that the

changes made to the number of records that were being

returned.

You know, we think that we provided a full

response to this interrogatory with respect to the time

period in dispute.

THE COURT:  They have a bunch of complaints

back, you know, three years ago or back in 2012 and

2013.  They changed their policy in 2014.

Why did those complaints have any bearing?

ATTORNEY GUZZO:  I believe these

complaints -- we went into this to 2012.  But I believe

anything that happened when this manual was switched

could be, potentially, relevant to show that they only

added a very minor variation of this policy.  And the

discussions that occurred at this time about why they

would change it and only add this policy.  If you'd look

even in the May 20, 2015 manual, it says,

"To reduce..." --  I want to read it directly, because I

think this is extremely important.

THE COURT:  Just -- just direct me to where

it is, and I'll read it.

ATTORNEY GUZZO:  If you look at project

overview, it's page number 43.

THE COURT:  I see it.  I see.

ATTORNEY GUZZO:  SafeRent 43.  And it says,

"The net outcome of this client feedback is SafeRent

modify the head logic rules to reduce the number of

false-positives.  Not to a eliminate the number of

false-positives, but just to reduce them.

And so one of the things I think was at

issue when this modification went down is how do we add

another wrinkle but not one that is too significant to

eliminate false-positives, just to make sure that we're

a little bit better.  And I think this directly

references, you know, the concern about the volume of

false-positives.

And the fact that SafeRent only added, essentially, one additional filter birth -- date of birth.  And to the extent that there has been continued consumer complaints, any audits of this particular policy, any research done, any comparison between the old numbers and the new numbers, that's important evidence for us in this case to show their knowledge.

This isn't someone coming in trying, you know, to win a paper ballot.  This is something that is very important to our case to show the knowledge and the foreseeability that this would happen to our client who didn't even share the same, you know, spelling of his name or date of birth with some of these convicted felons.  And I think that's really important evidence in your -- in this case, your Honor.

THE COURT:  Well, looking at the way that the interrogatory number six is worded, I do think it's overbroad and unduly burdensome given the scope of what it's asking for.  And based on that I am going to deny the motion to compel on interrogatory number six.

Obviously, you know, you can pursue some of that in your depositions as to whether individuals have studied or made any things; and if so, what their findings were, and that could be part of a topic in a 30(b)(6) deposition.  But I am not going to require any

response to that interrogatory as it's currently worded.

Okay.  I think that takes care of the issues.  As you all know, the court is available to oversee any settlement discussions, if the parties want to try and get together and resolve this case.

You know, there are a lot of issues in this case, and it may make sense before you were get too much further along in the discovery process to see if you can't get together and see can you can't get the case resolved.  But I can leave that up to you having made that offer, okay?

ATTORNEY GUZZO:  Thank you, Judge.

ATTORNEY ST. GEORGE:  Thank you, your Honor.

THE COURT:  Thank you.

(Court recessed in this matter at 11:02 a.m.)

---

CERTIFICATE

I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the motions hearing in the case of BRIAN TAYLOR v. CORELOGIC SAFERENT, LLC.

I further certify that I was authorized and did report by stenotype the proceedings in said motions hearing, and that the foregoing pages, numbered 1 to 49, inclusive, constitute the official transcript of said proceedings as taken from my machine shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this ___4th___ day of ___March_____, 2016.

_____/S/_____
Michael A. Rodriquez, RPR/CM/RMR
Official Court Reporter