UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

------------------------X

BRIAN TAYLOR,
    Plaintiff,
vs.
CORELOGIC SAFERENT, LLC,
    Defendant.

Civil Action No:
1:15-cv-1405-TSE-JFA

------------------------X

McLean, Virginia
March 31, 2016

Deposition of:

PRAVEEN CHANDRAMOHAN

the witness, was called for examination by counsel on behalf of the plaintiff, pursuant to notice, taken in the offices of Troutman Sanders, LLP, 1850 Towers Crescent Plaza, Suite 500, Tysons Corner, Virginia, beginning at 10:05 o'clock, a.m., before Jeannie M. LaCroix, a Verbatim Reporter and a Notary Public in and for the Commonwealth of Virginia at Large, when there were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiff:
    KRISTI CAHOON KELLY, ESQUIRE
    ANDREW J. GUZZO, ESQUIRE
    4084 University Drive, Suite 202A
    Fairfax, Virginia 22030

On behalf of the Defendant:
    RONALD I. RAETHER, JR., ESQUIRE
    TROUTMAN SANDERS
    5 Park Plaza, Suite 1400
    Irvine, California 92614-2545

Videographer: William Sale

CONTENTS

EXAMINATION ON BEHALF OF

| WITNESS | PLAINTIFF | DEFENDANT |
|---|---|---|
| Praveen Chandramohan | 4 | -- |

EXHIBITS
FOR IDENTIFICATION

| | |
|---|---|
| Deposition Exhibit No. 1 | Page 32 |
| Deposition Exhibit No. 2 | Page 51 |
| Deposition Exhibit No. 3 | Page 56 |
| Deposition Exhibit No. 4 | Page 77 |
| Deposition Exhibit No. 5 | Page 79 |
| Deposition Exhibit No. 6 | Page 81 |
| Deposition Exhibit No. 7 | Page 85 |
| Deposition Exhibit No. 8 | Page 86 |

-2-

NOTES:

**JEANNIE LACROIX**
P.O. BOX 33
OCCOQUEN, VIRGINIA 22125
(703) 690-3505

MINIDEP™
by Kenson

### Page 103

1  their continuous review of the proprietary processes
2  for SafeRent, that's who I should address my
3  questions to; is that fair to say?
4  A   That is correct.
5  Q   And you would provide -- you're part of
6  the Technical Team that would provide assistance to
7  seek out ways to enhance the ability to match?
8  A   That is correct.
9  Q   And can you think of any instances where
10 you have provided insight or assistance to help the
11 Product Team or the DAR Team enhance its ability to
12 match public records?
13 A   Yes, there are several.  So during the
14 course of Q3/Q4 last year, there was an effort to
15 get the baseline and try to improve the algorithms.
16 So the technical assistance that we provided was to
17 help the DAR Team with the current code, give them a
18 copy of "This is how it's implemented," help them
19 understand the code, provide access to data.  Those
20 are all different examples of how we provide that
21 assistance.
22 Q   And when you provided them copies of the
23 code or a document about how to implement it, did

### Page 104

1  you do that by e-mail?
2  A   It was through several modes.  Some were
3  e-mail, some were screen sharing showing them how to
4  look at it.
5  Q   What do you call the document that you
6  provided to help them implement the code -- that you
7  said to help show how to implement the code?
8  A   I don't think we call it by any name,
9  because I don't think -- There's not one document
10 that exists that we formally transition over to
11 DART, it's an everyday learning process.
12     So they would reach out to us frequently
13 ask for clarifications, and we would verbally
14 clarify.  If there is an example, sometimes we might
15 e-mail them, sometimes we might screen share and
16 show them.  So there are several modes of providing
17 that information to DART.
18 Q   And so you had communications with them
19 starting in quarter 3 of last year; is that correct?
20 A   Approximately in the context of this
21 particular project.  But we've had continuous
22 conversations with them throughout the year.
23 Q   And who was in charge of this project?

### Page 105

1  A   It would be the Product Team.
2  Q   So Mr. Doyle?
3  A   Jason is part of the Product Team,
4  correct.
5  Q   And is he the one in charge of this
6  specific project?
7  A   He has been delegated by his boss,
8  Suzette, to lead the project.
9  Q   Okay.  And so the project is to improve
10 the matching of public records?
11     MR. RAETHER:  Objection to form.
12     THE WITNESS:  The project's objective is
13 to research ways to find if there are ways to
14 improve.
15     BY MS. CAHOON-KELLY:
16 Q   And are you aware of any suggested
17 improvements that have come about from the project
18 so far?
19 A   So what I'm aware of is:  We did an
20 elaborate study.  And the conclusion at that time
21 was any changes to the current algorithm would start
22 impacting the balance of false-positives and false-
23 negatives.  So there needs to be more work done to

### Page 106

1  see if there are other ways to right that concern
2  and solve for that.  So that's how the first phase
3  ended.
4  Q   And what was that study called?
5  A   It was called entity matching.
6  Q   Entity matching?
7  A   Yeah, entity matching, that's how we
8  referred to that project as.
9  Q   And how did you get a copy of that study?
10 A   I was part of a regular project -- where
11 the DAR Team reported out the outcome of what they
12 were finding on a weekly and a monthly basis.
13 Q   So you would get monthly or weekly reports
14 or e-mails from the DAR Team; is that fair to say?
15 A   Weekly were calls, so I wouldn't say
16 reports would be generated on a weekly basis.  But I
17 do remember there were monthly presentations that
18 DART hosted to convey the status of the project.
19 Q   Were those PowerPoint presentations or --
20 A   Yes, from what I can recollect, they were
21 PowerPoint presentations.
22 Q   Okay.  And so you had said the result of
23 that study was that you couldn't -- I'm sorry, can

NOTES:

**JEANNIE LACROIX**
P.O. BOX 33
OCCOQUEN, VIRGINIA 22125
(703) 690-3505

MINIDEP™
by Kenson

1  you repeat for me the --
2     A   I only know the conclusion, I don't know
3  the specifics.
4     Q   Okay, sorry.
5     A   The conclusion was at the end of that
6  analysis, there was not much we could do with the
7  existing data points that we have; and that we would
8  have to research for other ways to improve the
9  accuracy of the algorithm.
10    Q   What do you mean when you say that there
11 wasn't much that you could do with your existing
12 data points; can you elaborate a little more, so I
13 can understand?
14    A   I think it goes beyond my expertise to
15 pinpoint specifically which area of which data
16 points. But at a high level, the limitation was on
17 the amount of structured data that we could get in
18 our database to solve the problems.
19    Q   So, essentially, what the outcome was --
20 if I'm paraphrasing this wrong correct me -- it was
21 that with the existing data you have, you couldn't
22 really have a better algorithm because you don't
23 have enough of the data you would need, or the
-107-

1  correct type of data to have more matching points?
2        MR. RAETHER:  Objection to form, lack of
3  foundation.
4        THE WITNESS:  Yes, I think because that's
5  too broad of a statement.  I think what I'm really
6  saying is it's within the existing frame work of the
7  algorithm in which it's implemented today.
8        BY MS. CAHOON-KELLY:
9     Q   I'm sorry, I just don't understand.  Can
10 you describe it in a different way for me, so that I
11 can understand?
12    A   So the algorithm and code operates a
13 certain way today.  Based on the current limitations
14 of how it can operate, the conclusion was we
15 wouldn't be able to do anything to that algorithm to
16 make it perform better while maintaining the balance
17 of the right false-positives and false-negatives.
18    Q   And the balance, what balance are you
19 talking about?
20    A   That would be a specific question for
21 DART, I wouldn't know.
22    Q   You don't know the balance that you're
23 trying to obtain?
-108-

1     A   Yes.
2     Q   So the outcome of the study was that you
3  would essentially have to change your algorithm?
4        MR. RAETHER:  Objection to form, lack of
5  foundation.
6        THE WITNESS:  No.  No, that's not the
7  outcome of the study.  The outcome of the study was
8  more research needs to be done to see if there are
9  possibilities to improve it.
10       BY MS. CAHOON-KELLY:
11    Q   Okay.  So the research that was done in
12 that study couldn't find ways to improve the
13 algorithm?
14    A   Correct, at that point in time.
15    Q   Okay.
16    A   And that's how we stopped that phase one.
17    Q   And so what's going on now in regards to
18 the algorithm or any studies?
19    A   I'm unaware of specific conversations.
20 That would be something that Product would be able
21 to answer.
22    Q   Okay.  Do you have any personal knowledge
23 about how the net worth was calculated for SafeRent?
-109-

1     A   No, not personal knowledge.
2     Q   Okay.  Have you provided copies of your e-
3  mails or any PowerPoints that you have to your
4  lawyers in this case regarding the matching rules or
5  hit logic rules?
6     A   No, I haven't.
7     Q   Do you have any e-mails or copies of
8  PowerPoints relating to the matching rules or any
9  studies that have been done?
10       MR. RAETHER:  Objection to form.
11       THE WITNESS:  I think if you can be more
12 specific about the question, then --
13       BY MS. CAHOON-KELLY:
14    Q   Sure.  The powerpoint presentations that
15 you would receive as part of the quarter 3 research
16 study --
17    A   Uh-huh.
18    Q   -- do you have access to those?
19    A   It was sent by the DAR Team to
20 participants of the meeting.  So I should have it in
21 my e-mail.
22    Q   Okay.  And would you have other e-mail
23 communications with other employees about the
-110-

NOTES:

**JEANNIE LACROIX**
P.O. BOX 33
OCCOQUEN, VIRGINIA  22125
(703) 690-3505

**MINIDEP**™
by Kenson

CERTIFICATE OF NOTARY PUBLIC

I, Jeannie M. LaCroix, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.



Jeannie M. LaCroix
Notary Public in and for the State of Virginia at Large

My commission expires: 1-31-17
Notary Identification Number: 129960

-116-

CERTIFICATION OF WITNESS

I, Praveen Chandramohan, do hereby certify that the foregoing contains a full, complete and accurate transcript of the testimony given by me at my deposition taken the 31st day of March, 2016, except for corrections, if any, made by me and duly noted herein:

PAGE     LINE     AS TRANSCRIBED     CHANGED TO

Date Signed         Signature of the Deponent

-117-

NOTES:

**JEANNIE LACROIX**
P.O. BOX 33
OCCOQUEN, VIRGINIA 22125
(703) 690-3505

MINIDEP™
by Kenson